114 So.2d 784 (1959)
CITY OF MIAMI, an incorporated municipality of and in Dade County, Florida; the City Commission of the City of Miami, Florida, and Robert King High, the Mayor of the City of Miami, and the individual commissioners, including Otis Shiver, George W. DuBreuil, B.E. Hearn, Sr., and James W. High; Walter Headley, the Chief of Police of said city, and E.A. Evans, as city manager of said city, Appellants,
v.
Abe ARONOVITZ, Appellee.
Supreme Court of Florida.
September 16, 1959.
Rehearing Denied October 27, 1959.
*785 William L. Pallot, Jack R. Rice, Jr., and Vivion B. Rutherford, Miami, for appellants.
Aronovitz, Aronovitz & Haverfield and Franks & Gordon and H.H. Eyles, Miami, for appellee.
Smathers, Thompson & Dyer, George F. Meister, Miami, Fla., Charles C. Collins, Ross D. Netherton, Jr., Washington, D.C., and Joseph H. Braun, Hugh Neill Johnson and Robert G. Corbett, Chicago, Ill., amici curiae, American Automobile Ass'n, Inc.
THORNAL, Judge.
The appellants here who were defendants below seek reversal of an order temporarily restraining them from systematically stopping automobiles for the purpose of checking drivers' licenses.
The principal question for determination is whether a municipal police department can operate a "road block" or similar system for the purpose of checking automobile drivers' licenses.
Appellee Aronovitz, a resident and former mayor of Miami, while operating *786 his automobile on a public street in the nighttime was intercepted by a police officer. He was directed to proceed in a line of traffic and was subsequently requested to exhibit his state driver's license. There is no claim that his vehicle was searched. There is no claim of any violation of the law by appellee. Upon exhibiting his license Mr. Aronovitz was sent on his way by the inspecting police officer. Rebelling against the procedure, Aronovitz filed a complaint against the City and individual appellant officials. He sought declaratory and related relief. He alleged that the practice of setting up a road block for the purpose of inspecting automobile drivers' licenses was an unconstitutional invasion of his rights to use the public ways. His complaint alleged that when he was intercepted and delayed for a period of time the action of the police officer constituted an arrest. He maintained that it amounted to an illegal search and seizure contrary to amendments IV, V, and XIV to the Constitution of the United States, and Section 1, and Section 22, of the Declaration of Rights of the Constitution of Florida, F.S.A. The complaint alleged further that the practice of the officers in demanding the production of the driver's license was a mere subterfuge to invade the right of the driver to be free from unreasonable and unwarranted interception and was employed primarily to enable the officers to search the vehicles. On the application for a temporary restraining order the Chancellor agreed with the appellee Aronovitz. He issued a temporary injunction restraining the appellants and all officers, agents, servants, and employees of the city
"* * * from interfering with, detaining, arresting or otherwise impeding the use of the city's roads, highways and other similar means of traverse by the use of "Road Blocks," or other scheme, plan or method of enforcing the laws against the plaintiff, Abe Aronovitz, or any other person, citizen or resident unless said defendants or their officers, agents, servants or employees should observe or have probable cause to believe that said Abe Aronovitz, or any person, citizen or resident has committed or aided in the commission of a crime."
The restraining order was supplemented by an opinion of the Chancellor in which he expressed the view that the conduct of the municipal police department, although carried on in good faith, was repugnant to the Federal and State Constitutions and was, therefore, an illegal exercise of governmental power. By interlocutory notice of appeal the appellants now seek reversal of the injunctive order.
It is the contention of the appellants that the practice which has been followed in the instant case is a reasonable exercise of the police power aimed ultimately at the orderly control of traffic and the prevention of traffic injuries and fatalities by apprehending and eliminating automobile drivers whose licenses have been revoked or suspended because of prior traffic offenses.
As he contended in the trial court, the appellee here contends, that the stopping of his vehicle and the interference with his travel without probable cause to believe that a crime had been committed constituted an illegal invasion of his rights under the State and Federal Constitutions.
By Chapter 322, Florida Statutes, F.S.A., the operator of a motor vehicle on the highways of this State is required to obtain a license to drive. Section 322.03, Florida Statutes, F.S.A., prohibits a person from driving a motor vehicle unless he has a valid license as an operator. There are some exceptions which we need not notice.
The part of the statute which generated the instant dispute is Section 322.15, Florida Statutes, F.S.A., which reads as follows:
"Every licensee shall have his operator's or chauffeur's license in his *787 immediate possession at all times when operating a motor vehicle and shall display the same, upon demand of a patrol officer, justice of the peace, a peace officer, or a field deputy or inspector of the department. However, no person charged with violating this section shall be convicted if he produces in court an operator's or chauffeur's license theretofore issued to him and valid at the time of his arrest."
The Chancellor, upon the insistance of the appellee apparently took the position that the quoted statute merely required the driver of an automobile to have his license available for identification purposes in the event of a collision or some similar circumstance.
It should be recalled that Mr. Aronovitz, along with numerous other citizens, was intercepted on a public way by the municipal police officer who was making a systematic check of licenses. He does not allege that he was subjected to any other type of search or seizure. He contends that he was placed under formal arrest when the officer intercepted him and ordered him to produce his driver's license. This record fails to sustain any conclusion that the interception of Mr. Aronovitz was a mere subterfuge to search his automobile or otherwise to abuse or exploit the power granted by statute to check his driver's license.
The appellee takes the position that he has an inherent right as a citizen to enjoy the use of the public highways. For support he refers us to Florida Motor Lines, Inc. v. Ward, 102 Fla. 1105, 137 So. 163. While the cited decision does mention a citizen's "inherent right" to use a public way, it further recognizes that such right necessarily remains subject to reasonable regulations in the interest of the public welfare.
We have expressly decided that the requirement of obtaining a driver's license and the exercise of the privilege of driving over the public highways, together with the correlative loss of the privilege under certain conditions, is a reasonable regulation of an individual right in the interest of the public good. In Thornhill v. Kirkman, Fla. 1953, 62 So.2d 740, we aligned this Court with those which hold that acquisition of a driver's license is a reasonable requirement and that the privilege granted by it remains subject to suspension or revocation for cause. The owner of such a license exercises the privilege granted by it subject to reasonable regulations in the use of the highways common to all citizens. These requirements do not disregard the constitutional guaranties upon which the instant appellee relies. We are committed to the view that so long as the regulations themselves are reasonable and are reasonably executed in the interest of the public good, the courts should not interfere. Thornhill v. Kirkman, supra; Smith v. City of Gainesville, Fla. 1957, 93 So.2d 105.
We judicially know that as originally contemplated the drivers' license requirement was enacted primarily as a source of revenue to finance the maintenance of the State Department of Public Safety. Time has proven, however, that because of the severe penalties attendant upon serious traffic violations, including suspension or revocation of drivers' licenses, this requirement has become an essential segment of our laws for the control and prevention of traffic accidents and fatalities. The public records reveal that during the first six months of the current calendar year over two and one-half million drivers' licenses had been issued in Florida. It is a privilege to hold a license to drive. It is a severe handicap to be compelled to do without one. Suspension or revocation of drivers' licenses is one of the most effective measures to compel observance of the traffic laws.
When a license is revoked or suspended it is of major importance that the operator *788 so restricted be prevented from driving an automobile during the penalty period. This is so because otherwise the restriction would be meaningless. Even more important, operators who have been proven to be negligent, incompetent and a public hazard would be in a position to continue operating motor vehicles without fear of apprehension or restraint in the absence of some reasonable inspection system. Consequently, it is very much in the public interest that law enforcement officers be permitted to make periodic check-ups on the driving license qualifications of those who operate motor vehicles on the highways. The toll of traffic deaths proclaims the demanding necessity for the exercise of every lawful requirement to compel careful driving. In Florida during 1958, 1,139 people were killed in traffic fatalities. During the same period there were over 100,000 traffic accidents. In 1959, by the end of July, nearly 600 people had come to their deaths on our highways. There are more than 2,268,000 motor vehicles licensed in Florida and over 428,000 licensed in Dade County alone. Giving recognition to our established judicial viewpoint that an automobile is a dangerous instrumentality, we must conclude that any procedure lawfully directed toward the effective prevention of the negligent operation of the automobile and the imposition of requirements of competency on the part of the driver thereof, should meet with judicial approbation.
We are not advised of any court which has been squarely confronted with the problem here presented. Strangely enough this case appears to involve the first time that point has been asserted under these circumstances. However, the well prepared briefs of the parties and the helpful brief of amicus curiae refer us to several decisions in which the courts have by implication recognized the propriety of stopping a motor vehicle and demanding an inspection of the driver's license. 5A Am.Jur. Automobiles and Highway Traffic, Section 134, page 322; 3 Fla.Jur., Automobiles and other Motor Vehicles, Section 41, page 511.
In Byrd v. State, Fla. 1955, 80 So.2d 694, this Court had under consideration the validity of a search of a truck by a sheriff who assertedly stopped the machine to ascertain whether the driver was duly licensed. In the ultimate we held that the search was invalid, because the stopping of the truck was a mere pretext unrelated to the subject of the search. However, we did in effect recognize that under proper conditions a law enforcement officer would be authorized to stop a vehicle in order to examine the driver's license. In Byrd v. State, supra, we were confronted with a situation not now presented. We emphasize here that we are not passing upon the validity of a search of a vehicle which has been intercepted merely for the purposes of examining the license of the driver. We sound this word of caution to avoid any notion that this opinion comes in conflict with Byrd v. State, supra, or cases such as Collins v. State, Fla. 1953, 65 So.2d 61, or Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, which has been given legislative sanction in Florida by Section 933.19, Florida Statutes, F.S.A.
In the matter of stopping and searching motor vehicles the conduct of the law enforcement officer is governed by the rule of Carroll v. United States, supra. In this connection nothing can be accomplished by laboring the ultimate judgment of that decision. The Florida Legislature has by Section 933.19, supra, incorporated the entire decision into the statute law of this State. Every law enforcement officer, as well as this Court, is bound by this legislative enactment. See Chacon v. State, Fla. 1958, 102 So.2d 578, 585 (On Re-hearing). We are compelled to advise that this opinion be read in the light of the statute last cited. We must warn that because of this statute the power to intercept an automobile and check a driver's license does not a priori convey the power to search the vehicle. If the law on this subject is to be *789 changed, the transformation must have its inception in the legislative branch of the government.
The situation presented on the application for the temporary restraining order in the lower court merely showed that the appellee was intercepted by the police officer, the production of the driver's license was demanded and permission to proceed without further interruption was granted when the license was produced. This is not a search and seizure case. We are not passing on the admissibility of any evidence that might be obtained solely and entirely as the result of such procedure. The facts shown here do not present any such issue.
Other states in similar fashion have impliedly recognized the propriety of stopping vehicles for drivers' license inspection. Similarly, also, many of these courts have condemned the idea of employing drivers' license inspections merely as a surrepticious subterfuge for embarrassing a motorist and making a detailed search of his automobile without cause to believe that the law is being violated, or in the absence of a violation in the presence of the officer. State v. Farren, 140 Ohio St. 473, 45 N.E.2d 413, 143 A.L.R. 1016; Cox v. State, 181 Tenn. 344, 181 S.W.2d 338, 154 A.L.R. 809; Robertson v. State, 184 Tenn. 277, 198 S.W.2d 633; Croson v. District of Columbia, 55 App.D.C. 122, 2 F.2d 924; Blashfield Cyclopedia of Automobile Law and Practice (Perm.Ed.) Chap. 12; United States v. Bumbola, D.C., 23 F.2d 696.
We do not disregard the contentions of the appellee, supported by amicus curiae, to the effect that the exercise of the power here in dispute could be abused, to the immeasurable injury of a citizen and with complete disregard of the freedoms safeguarded by our State and Federal Constitutions. The possibility that a power of government may be abused if improperly asserted under conditions which do not justify it is not necessarily a valid argument for denying the existence of the power or its reasonable exercise in a proper case in the interest of the public good.
We have here attempted to demonstrate the essentiality of proper and reasonable regulations controlling the operation of motor vehicles as an aspect of the police power. One cannot overlook the importance of the public's claim to protection against incompetent dangerous or unqualified motor vehicle operators. It is not inappropriate to remind that the provision in the Preamble to our Federal organic document that suggests its approval to "secure the Blessings of Liberty to ourselves and our Posterity", is preceded by the commitment that the charter was also promulgated to "promote the general Welfare". In matters of the type before us, it is essential that we recognize the individual right and that we simultaneously reconcile the enjoyment of that right with the needs of the general good.
The appellee urges our sanction of the injunctive order as a judicial condemnation of what he alleges to be a vicious encroachment upon individual freedoms. We must remember, however, that constitutionally prescribed freedoms are not to be regarded as unbridled licenses to defy the orderly conduct of society. Indeed, as Mr. Daniel Webster so aptly counseled, "liberty exists in proportion to wholesome restraint". See Webster's address to the Charleston Bar, May 10, 1847.
Viewed from this perspective the appellee claims injunctive restraining against a reasonable and proper exercise of a ligitimate power of government. To this end we think the Chancellor painted his injunctive mandate with too wide a brush. The effect of the order which we quoted at the outset appears to us to produce almost total disablement of law enforcement officers in the performance of a needed police power which has been granted to them by the Legislature, and which when properly exercised, is not condemned by the organic law. We have been presented no showing sufficient to support the temporary injunction.
*790 Jurisdiction comes to us under Article V, Section 4(2), Florida Constitution, where we are authorized to review directly interlocutory orders in chancery matters which upon a final decree would be directly appealable to this Court. We think that by his decree and supporting opinion the Chancellor construed controlling provisions of both the State and Federal Constitutions. Hence, the basis for our jurisdiction.
In view of what we have held, the decree granting the temporary injunction must be reversed.
It is so ordered.
THOMAS, C.J., and ROBERTS, DREW and O'CONNELL, JJ., concur.