JAMES C. LYNCH *v.* STATE OF INDIANA.

[No. 970S226. Filed April 5, 1972.]

*James H. Douglas, Douglas, Douglas & Douglas,* of Valparaiso, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert A. Zaban,* Deputy Attorney General, for appellee.

GIVAN, J.—Appellant was charged with the crime of second degree burglary. Trial by court resulted in a finding of guilty. Appellant was sentenced to the Indiana State Reformatory for not less than two nor more than five years.

The record reveals the following facts:

Indiana State Police Trooper Richard E. Pinnell was patrolling Highway 12 near the town of Pines in Porter County, Indiana, in the early morning hours of January 12, 1970. As the trooper drove east on the highway he observed the appellant's car headed in the same direction moving at a slower than normal rate of speed. As the trooper approached, appellant's car drove from the highway into a trucking company lot and stopped approximately 75 yards from the company building. This action aroused the suspicion of the officer who proceeded down the highway a short distance, then turned around to investigate. As the officer traveled west on the highway he saw appellant's car again enter the highway also traveling in a westward direction but without headlights or taillights. After following appellant's vehicle a short distance, the officer turned on his red lights and spotlight and stopped

appellant's vehicle. When the officer turned on his spotlight he observed the passenger in appellant's car remove his coat and lay it in the back seat of the car. The officer testified:

> "This got me curious and worried at the same time as to why they would be doing this because it was chilly that night."

The officer approached the appellant's vehicle with both the appellant and his passenger still in the front seat. The officer asked the appellant for his driver's license and registration. At the same time he observed beer and cigarettes laying in the back seat where the passenger had placed his jacket. The passenger appeared to be under 21 years of age and the officer first suspected this might be the reason they were trying to hide the presence of beer in the car.

The officer then asked the occupants to get out of the vehicle. When the driver's door was opened, the officer discovered a hunting knife laying on the floor beside the driver's seat. The officer required the two men to go to the rear of their car, placing them between the two vehicles. At this time the officer observed a money order machine on the back seat of the car.

Identification papers established that James Lynch, the appellant, was the driver of the vehicle and Gerald Lynch was the passenger.

The officer asked them what they were doing with a money order machine. Gerald Lynch stated that it was his company's machine. Upon closer examination the officer saw money order blanks in the name of the "Pines Grocery." At this time the officer notified the State Police Post that he had two suspects who he believed had committed a burglary in the area; that he was not sure where the burglary had been committed, but he suspected that it was the Pines Grocery.

After securing the prisoners, Tropper Pinnell, accompanied by Trooper Bonfield, who had answered Pinnell's call for assistance, proceeded to the Pines Grocery where they discovered

a burglary had been committed. Several of the items found in the back seat of appellant's car were identified by the owner of the Pines Grocery as items taken from the store that evening.

Prior to the trial the appellant had filed a motion to suppress the evidence which had been in the back seat of his automobile and was seized at the time of his arrest. The motion to suppress was overruled and appellant's oral objection to the introduction of such evidence was overruled during the trial. It is appellant's contention the trial court erred in overruling his motion to suppress. It is appellant's contention that the evidence was obtained as a result of an illegal search. He claims the search was illegal because there was no arrest for any crime prior to the searching of the automobile. We observe the appellant to be wrong in two respects. First, there was no search conducted by the arresting officer. The items of evidence which the appellant claims were obtained by a "search" were in open view in the back seat of the car at the time the officer made a lawful arrest for operating a motor vehicle on the highway at night without lights. The fact that one of the men in the automobile placed a coat over some of the items which had been taken in an earlier burglary did not in our opinion constitute a sufficient covering of the items to necessitate a search to determine their presence. The police officer testified that when he turned on his spotlight and red light he observed one of the men in the car place the coat in the back seat. After stopping the car, when the officer shined his light into the back seat the coat was obviously covering objects which were plainly there. *Alcorn* v. *State* (1970), 255 Ind. 491, 265 N. E. 2d 413, 24 Ind. Dec. 268.

Appellant is also mistaken in his claim that no arrest occurred prior to the discovery of the items in the vehicle. From the time the officer first observed the vehicle the occupants acted in a suspicious and furtive manner and obviously took evasive action in an attempt to

escape the officer's observation, even to the point of violating the law in driving on a public highway in darkness without any lights. At the time the officer turned on his red light and spotlight stopping the appellant and his companion a valid arrest was made. *Peterson* v. *State* (1968), 250 Ind. 269, 234 N. E. 2d 488, 13 Ind. Dec. 321.

If we would assume for the sake of argument that a search was conducted by the officer to determine the presence of the stolen goods, there was ample evidence from which the trier of fact could determine that the officer had probable cause to conduct such a search.

From these facts the trial court could find that the officer had probable cause to suspect that a felony had been committed. The fact that the officer did not know that the particular burglary during which the property had been taken had been committed is of no moment in the instant case.

This Court has previously stated in *Stearsman et al.* v. *State* (1957), 237 Ind. 149, 167, 143 N. E. 2d 81:

> "Appellants appear to contend that since the arresting officer did not know of the burglary which had been committed in Evansville, Indiana, at the time of the arrest, they could not have had reasonable cause to believe then that the appellants were guilty of the burglary for which they were convicted. In our opinion the above quotation from the Pearman Case is not subject to any such construction.
>
> "It has long been the settled rule in Indiana that evidence obtained incidental to an arrest upon reasonable cause to believe that the person arrested has committed a felony, not necessarily the one for which such person might eventually be tried and convicted, is admissible in the trial for an offense other than that for which the arrest is made. *Haverstick* v. *State* (1925), 196 Ind. 145, 150, 147 N. E. 625; *Smith* v. *State* (1939), 215 Ind. 629, 634, 21 N. E. 2d 709; *Rucker* v. *State* (1948), 225 Ind. 636, 639, 77 N. E. 2d 355; *Arthur* v. *State, supra* (1949), 227 Ind. 493, 499, 86 N. E. 2d 698. Hence, the evidence obtained as an incident to the arrest of appellants, even though the probable cause for their arrest was the belief that another felony had been

committed, was admissible on their trial for the commission of another felony—the burglary in Evansville, Indiana."

The very use of the words "probable cause" or "reasonable grounds to believe" when used in conjunction with arrest by a peace officer for a felony indicates that the officer is not in possession of all the information which may be necessary to support a conviction. If the officer was in possession of such information, then we would have an arrest of a person for the commission of a felony in the presence of an officer, and the question of "probable cause" or "reasonable grounds for belief" would not exist. This is well recognized in this and many other jurisdictions. See *Bays* v. *State* (1959), 240 Ind. 37, 49, 159 N. E. 2d 393. In a footnote at page 49 in the *Bays* case this Court cited 4 Wharton's Criminal Law and Procedure, § 1596, p. 244, as follows:

" 'He (an officer) may arrest any person who he, upon reasonable grounds, believes has committed a felony, even though it afterward appears that no felony was actually perpetrated.' "

Were we to hold in situations such as in the case at bar that an alert and observing police officer, who observes conduct such as that above described, cannot follow through on reasonable deductions from these observations, even to the extent of looking into the back seat of the vehicle which he has lawfully stopped for a traffic violation, then we are making a mockery of good police work. This Court previously stated in *Capps* v. *State* (1967), 248 Ind. 472, 479, 229 N. E. 2d 794, 11 Ind. Dec. 287:

"In our modern mass society, in which a felon can quickly escape to the safety of his residence or disappear into the crowd after breaking the law, fast action by law enforcement agencies which might result in apprehension of the criminal within minutes of the crime is of great importance. Where the police demonstrate an ability to accomplish an almost instantaneous arrest of the wrongdoer, as was done in this case, public confidence in law enforcement agencies grows, the public sense of security is strengthened, and po-

tential felons may be moved to reconsider the magnitude of the risk they would take by laying their freedom on the line in committing a serious crime.

"It would be neither wise nor judicious for this Court to penalize the police for their efficiency and alertness where their action, has not resulted in the infringement of a citizen's substantial rights. For this Court to say that the information possessed by the arresting officers in this case was not sufficient or trustworthy enough to give them probable cause to arrest the defendant would be to take the handcuffs off the criminal and put them on the police."

To emphasize the urgency of the need for the officer to make an investigation such as that made in this case, let us suppose that instead of stolen merchandise the appellant had covered a small child, who had been kidnapped and bound and gagged, would it be reasonable to say that the police officer before being permitted to lift the coat to discover the child, would have to have the vehicle towed to a garage, go before a magistrate, obtain a warrant, return to the vehicle and then discover the child. We do not perceive this to be the law in Indiana.

The trial court is affirmed.

Arterburn, C. J. and Hunter and Prentice, JJ., concur; De-Bruler, J., dissents with opinion.

### DISSENTING OPINION

DEBRULER, J.—I dissent. This case involves a routine stop of a motorist for driving without proper lights. The officer's suspicions were aroused when he observed the passenger lay his coat on the backseat and when he saw beer and cigarettes on the backseat of the car. He ordered both occupants out of the car and had them stand between the two vehicles while he checked their identification. Then, being curious about the contents of the car, he left the occupants standing by his car while he proceeded to search the backseat of the automobile. Under the coat in the backseat of the car he found a money

order machine which was ultimately traced to a store which had been burglarized.

The appellant attacked this search and attempted to exclude the fruits thereof on the ground that the search was a mere exploratory invasion unsupported by either a proper warrant or by any exigent circumstances that would justify the search of the car. Both a pre-trial and an in-trial motion to suppress the evidence found were unsuccessful, and this appeal followed.

For an accurate description of the events leading up to the search, we quote the officer's own testimony, as follows:

"Q. Did you ever arrest the defendants prior to searching their car?

A. They were placed under arrest when I found the money order machine in the back seat.

Q. At that time were they outside the car?

A. Yes, they were.

Q. Now, as I understand it, you went up along the left-hand side of the car along the driver's side?

A. Yes.

Q. You asked James Lynch for his driver's license and registration?

A. Right.

Q. Did he give these to you?

A. He was in the process of it when I had him get out of the vehicle.

Q. So before you even had the driver's license you asked him to get out of the car, is that right?

A. That's right.

Q. Did you open the door?

A. Yes.

Q. And at that time you saw the knife?

A. Yes.

Q. You did not see the knife prior to that?

A. No.

Q. Did you have any reason to believe there was a knife there?

A. Not prior to opening the door, no.

Q. Officer, is it customary to have suspects for a driving violation get out of the car?

A. It's done quite often.

Q. At this time, as I understand, when you first came up you saw beer in the back seat and cigarettes, is that correct?

A. Yes.

Q. And that's all you saw?

A. And I saw the handle of the machine when I looked back there, yes.

Q. Was this before the door was open?

A. No.

Q. But prior to opening the door and asking the defendants to get out of the car, you saw beer in the back seat and cigarettes in the back seat and that was all?

A. Right.

Q. At the time you pulled out to stop the defendants, did you intend to arrest them for a traffic violation of having no lights on?

A. This all depends on their ability for walking conditions and also on what kind of excuse they had for driving without their headlights. They may have had a very good reason for it. At the time I stopped them, I didn't know.

Q. Now prior to actually finding this so-called evidence in the car, had you any notice that there was a burglary in the area?

A. No.

Q. Had you had any calls to be on a lookout for this car?

A. No.

Q. Or the defendants?

A. No.

Q. So, as I understand it, the sole reason you stopped them was they had their headlights out?

A. Right.

Q. Officer, after you opened the door and saw the knife you had the defendant get out of the car, is that right?

A. I was having the defendants get out of the car when I found the knife.

Q. After you found the knife did you search the defendants at this time?

A. Not exactly at this time, no.

Q. I assume that you were careful enough so that if they were armed you were in a position to protect yourself?

A. Right. Gerald Lynch was ordered to have his hands on my hood and stay at this position.

Q. Did you feel yourself in any immediate danger?

A. I always feel this way.

Q. Well, any more than usual? Let's put it that way?

A. I was being as cautious as possible after finding the knife, but I didn't suspect that they would try anything immediately, no.

Q. Well, the search of the automobile was not in order to protect yourself, was it?

A. No.

Q. And once again, there was no arrest made until after the car had been searched, is that correct?

A. Right. The car was not completely searched at this time. It was after I found the machine that they were put under arrest at this time. It was a preliminary."

Further, when speaking of the actual search, the officer testified as follows:

"I had them go behind the car between the two vehicles, my vehicle and their vehicle, and got their identification from them.

I seen the beer in the back of the car and I wanted to check it out for cigarettes and everything, and I had Gerald Lynch put his hands on the hood of my car and the other subject stand by the back end of his car.

At this time I observed a money order machine on the back seat of the car."

The majority opinion needs no extended rebuttal. Finding no search on an "open view" theory since there was plainly something hidden in the backseat, and in addition intimating that the officer can search an automobile on nothing next to a mere suspicion or hunch, are so far from the careful con-

stitutional standards governing plain view cases and searches in general that they render themselves difficult to rebut.

As to the plain view theory, the facts are clear that the officer got both occupants out of the car and then returned to the car and rummaged through the backseat of the automobile. There was no inadvertent discovery of contraband in this case and nothing seizable was in view from the outside of the automobile. See *Coolidge* v. *New Hampshire* (1971), 403 U. S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564. It is inconceivable to me that this seizure could be justified on the ground that the articles were in plain view when the record shows that the check-writer was hidden under the coat in the backseat.

As to the theory that the officer had probable cause to search, it is patent in my opinion that a magistrate would not have found the probable cause required to issue a warrant in such a case. See I.C. 1971, 35-1-6-2, being Burns § 9-602, for requirements governing the issuance of a search warrant. If there had been time to procure a warrant, the officer would have been unable to obtain one where he had no knowledge of *any kind* concerning criminal behavior or of items specifically to be seized. Although the mandatory requirement of *obtaining* a search warrant is relaxed in certain cases involving automobiles, there is not and cannot be a relaxation of the constitutional requirement of probable cause to support a search. Neither the act of placing a coat in the backseat, nor the presence of beer and cigarettes in the automobile, have *any* significance at all for *any* specific criminal behavior *until* we decide the occupants are guilty of some crime. Then, of course, every move and every word can be marshalled against the accused. However, we do not live in a society where the results of a search can be used to justify it. *Ferry* v. *State* (1970), 255 Ind. 27, 262 N. E. 2d 523.

In this case a citizen who was stopped for driving without lights made a move innocent in itself, which caused the officer to become suspicious. He was removed from the car, forced

to put his hands on the police car, and kept in that position while the officer rummaged through his possessions in the backseat of the car. If nothing had been found in this case, two citizens, embittered by the diminishing areas of individual freedom in this country, would have driven on into the night. The fact that we do not hear their story on appeal, and the fact that the appeals we do hear all concern "hunches" which have paid off, should not blind us to our duty under the Constitution to protect the individual citizen of this country from an illicit intrusion by the State.

NOTE.—Reported in 280 N. E. 2d 821.