JOSEPHUS W. WILLIAMS AND MAYLON J. ROGERS *v.*
STATE OF INDIANA.

[No. 274S38. Filed February 20, 1974.]

*Harriette Bailey Conn,* Public Defender, *Malcolm K. Mc-Clintick,* Deputy Public Defender, for appellant.

*Theodore L. Sendak,* Attorney General, *A. Frank Gleaves, III,* Deputy Attorney General, for appellee.

ARTERBURN, C.J.—On appeal from the denial of a Post-Conviction Relief Petition, the Court of Appeals in an opinion by Sullivan, J., White, J., concurring in result, Buchanan, J., dissenting, reversed the trial court. The State, as Appellees, petitioned this Court for transfer. We heard oral argument. We grant transfer and reverse the Court of Appeals and affirm the judgment of the trial court.

Appellants were convicted of Robbery. Certain items of evidence were seized following the stopping of Appellants' automobile. Appellants contend that the trial court erred in admitting the seized evidence. The trial court held that the arresting officers acted lawfully in stopping Appellants' car despite the absence of probable cause to arrest. It is this conclusion which the Appellants challenge.

At 10:02 p.m. of the night in question, Indiana State Police Sergeant Cox and Trooper Fox were on routine patrol duty in an unmarked police car when they received a radio dispatch informing them that seven (7) minutes earlier a robbery had been committed at the King's Crown Motel of West Lafayette. A second radio report was received. From these two reports the officers learned that the suspects were two male Negroes and that they were possibly traveling northwest.

At the time of these reports, the officers were located on State Road 18, four miles east of U.S. Highway 231, and fifteen miles northwest of the scene of the crime. Knowing Highway 231 to be a major link-up between Highway 52 and Interstate 65 (the most direct route to a possible escape location such as Chicago), the officers proceeded directly to the intersection of Highways 18 and 21.

It took the officers about three minutes to reach this point. They observed in the next two to four minutes two cars heading north. When a third car came by, the officers thought the driver, apparently the only occupant of the car, might be a Negro.

At this time, the officers had deduced that if the suspects were indeed enroute directly to Chicago, they could be observed at just this point. Sergeant Cox testified that:

> "We knew that a crime had been committed. We knew from the time element that the individual we were looking for had time to be at about this location at about this time."

Acting upon this hypothesis, the officers decided to follow the automobile. After receiving a third radio dispatch stating

that one suspect had used a sawed-off shotgun or pistol in the robbery, the officers overtook the car they were following in an unsuccessful attempt to get a better look at the driver. Then, the officers proceeded a short distance to an intersection located at the South edge of the town of Wolcott, and parked in a service station drive. When the car they had been observing stopped at the intersection, the improved lighting conditions allowed one officer to become certain that the driver was a Negro, although the other officer still was not certain.

The officers then used an inside red light to stop the car at the side of the road. The driver (Appellant Williams) left his car and approached. Trooper Fox, the driver of the police car, asked the man to stop. The two officers approached the car, one on each side. As Trooper Fox asked to see the driver's license, he looked into the stopped car and saw a person hiding on the back seat. As the second man (Appellant Rogers) exited the right door of the car, that door was left open and Sergeant Cox saw a sawed-off shotgun in plain view. These occurrences led the police officers to place the Appellants under arrest and to seize the incriminating evidence used at trial. The Appellants were later positively identified as the robbers by employees of the motel.

There is here no contention that the formal arrest of the Appellants was without probable cause. [Indiana law defines arrest as the taking into custody of a person for the purpose of having him answer for a public offense. IC 1971, 35-1-17-1, [Burns Ind. Ann Stat. § 9-1004 (1956 Repl.).] There is no contention that the seizure of the incriminating evidence was not lawful. The sole contention is that the initial stopping of the Appellants' car was unlawful and that, therefore, the fruits of this unlawful seizure must be excluded from the trial. Wong Sun v. United States (1963), 371 U.S. 471; Mapp v. Ohio (1961), 367 U.S. 643; Weeks v. United States, (1914), 232 U.S. 383.

The legal question that confronts us, to be very specific,

is: did the police officers have the right to stop the motorist on the basis of the suspicion created by the meager facts received over the radio and the police officers calculations from those facts? After the stopping of the Appellants' car, it became immediately apparent without a search, but from open observation (the shotgun and the passenger hiding in the car) that probable cause existed for the arrest of the Appellants. If the stopping was legal, then all that followed was legal. As Justice Hunter has said, in situations of this sort the question is "whether the facts known at the time he (a police officer) stopped the car were sufficient to warrant a man of reasonable caution in the belief that an investigation was appropriate." *Luckett* v. *State* (1972), 259 Ind. 174 at 180; 284 N. E. 2d 738 at 742. Justice Hunter went on to observe that in the situation presented in *Luckett* "we find nothing unreasonable in permitting the investigating officer to request that an operator's license be produced by the driver of the vehicle. . . . Furthermore, it should certainly be permissible for the officer to observe the occupants of the automobile, and to take cognizance of any items in the automobile which are in plain view." *Luckett, supra,* at 742.

In fact, this case presents squarely to us the question whether or not under similar circumstances a roadblock could be set up at certain points where it has reasonably been calculated that fleeing robbers might be apprehended. Justice Jackson of the United States Supreme Court, dissenting from the approval of a seizure and search, realized and noted the problem, commenting as follows:

"If we assume, for example, that a child is kidnapped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious

crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger."

*Brinegar* v. *United States* (1948), 338 U.S. 160 at 183. However, the suggestion by Justice Jackson that the right to stop depends upon the enormity of the crime creates an uncertain and hazardous standard for police officers to follow.

In *Terry* v. *Ohio* (1968), 392 U.S. 1, the United States Supreme Court had before it a situation in which a police officer with thirty (30) years experience on a particular beat became suspicious of the actions of two men who repeatedly and alternately made numerous round-trip strolls past a store window. The officer accosted these men when they were conferring with a third man with whom they had previously conferred during their strolls. In a brief "pat down" or "frisk" the officer discovered concealed weapons on two of the men. In upholding this particular "search and seizure" the Supreme Court said that:

> ". . . in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard; would the facts available to the officer at the moment of the seizure 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? CF. Carroll v. United States, 267 US 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 ALR 709 (1925); Beck v. Ohio, 379 US 89, 96-97, 13 L. Ed. 2d 142, 147, 148, 85 S. Ct. 223 (1964)." *Terry supra,* at 392 U.S. 21-22.

Our society has a right to protect itself. What is "unreasonable" under the Fourth Amendment is a function of the totality of conditions existing within our society at any moment in history. Social interests under

the police power should give law officers the right to stop users of the highways to check, for instance, their right to use the highway or to check the vehicles for safety standards. *Myricks* v. *United States* (1967), 370 F. 2d 901 (5th Cir.) (Texas) ; *Lipton* v. *United States* (1965), 348 F. 2d 591 (9th Cir.) (California) ; *State ex rel. Berger* v. *Cantor* (1971), 13 Az. A. 555, 479 P. 2d 432 (Arizona Ct. of App.) (license, registration, safety checks) ; *Mincy* v. *District of Columbia* (1966), 218 A. 2d 507 ; *City of Miami* v. *Aronovitz* (1959), 114 So. 2d 784 (Florida) (roadblock for license check) ; *Commonwealth* v. *Mitchell* (1962), 355 S. W. 2d 686 (Kentucky) (roadblock for license check) ; *State* v. *Kabayama* (1967), 98 N. J. Super. 85, 236 A. 2d 164 (New Jersey) (roadblock for safety inspection) ; *Cox* v. *State* (1944), 181 S. W. 2d 338 (Tennessee). Indeed, in California, a state intensively affected by the automobile, the police have been permitted to stop a car on "founded suspicion," *Wilson* v. *Porter* (1966), 361 F. 2d 412, 415 (9th Cir.), and to effect a brief detention of anyone—including motorists— for investigative purposes whenever "reasonably . . . necessary to the proper discharge of [their duty]." *Bramlette* v. *Superior Court* (1969), 273 Cal. App. 2d 799, 805, 78 Cal. Rptr. 532, 535 (Ct. of Appeals).

Similarly, we have the searches of passengers boarding airplanes. *United States* v. *Legato* (1973), 13 Cr. L. 2303 (5th Cir.) ; *United States* v. *Bell* (1972), 464 F. 2d 667 (2nd Cir.) *cert. denied,* 409 U.S. 991 (1973) ; *United States* v. *Lindsey* (1971), 451 F. 2d 701 (3d Cir.) *cert. denied,* 405 U.S. 995 (1972) ; *United States* v. *Rivera* (1973), 13 Cr. L. 2234 (D. C. N. Y.) Such procedures have been very effective in deterring "hijacking", and insofar as our limited observation reveals have met with the traveling public's approval.

We offer the following hypothetical: At a party of, say, twenty or so persons a valuable diamond ring is discovered to be missing from the person of one of the guests. Absent any more information, there would not be probable cause

to detain one specific individual from among the persons present, but would it be unreasonable to detain *all* the persons present?  A distinction may exist between what is a reasonable restraint of an individual and what is a reasonable restraint of an identifiable group.  The interference with citizen liberty described in the above situations may be rationalized on the basis that although there is not probable cause for suspicion of one specific person, probable cause does exist as to an identifiable group (e.g.) those persons using the highways at a certain time and certain place in the aftermath of a crime, those persons boarding airplanes, those persons at the party.

It has been said that constitutional interpretation must conform to the changes which progress has wrought in our society since the adoption of the Constitution.  The classic formulation is that of Chief Justice Marshall's:

> ". . . we must never forget that it is a constitution we are expounding. . . .
>
> \* \* \*
>
> . . . a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs. . . ."

*M'Culloch* v. *Maryland* (1819), 4 Wheat. 314, 407, 515, 4 L. Ed. 579, 602, 603.  The automobile has made an alteration in our way of life unforseen and unforeseeable by the Founding Fathers.  It is our duty to be rational and sensible in our constitutional interpretation so that modern society is not damaged or injured by an irrational and unrealistic refusal to recognize the necessities brought about by these changes.  The primary purpose of government is the protection of society.  An instrument should not be so interpreted as to thwart that main objective.

If the police officers under the facts before us had observed the incriminating evidence inside the car while it was parked on the roadside, there would be no question here as to the right of the officers to arrest the driver and the occupant and to make a further search.  *United States* v. *Robinson* (1973), 42 LW 4055.

As we previously stated, the question before us is whether or not suspicion such as the officers had in this case is a sufficient basis for the stopping of an automobile upon the public highway. We believe that it is, and that such pronouncement is a reasonable interpretation of constitutional rights which are rights that belong to the public [the State] as well as to a defendant in a criminal case. Courts have to balance out the rights and have done so in the past. We think that this case falls within the purview of *Luckett, supra,* and *Terry, supra.* The judgment of the trial court is affirmed.

Givan, J. concurs; Hunter, J., concurs in result with opinion; Prentice, J., dissents; DeBruler, J., dissents with opinion.

### CONCURRING IN RESULT

HUNTER, J.—Probable cause for arrest is not the central issue before us. Rather, we are confronted with an examination of the *reasonableness* of an investigative detention of a motor vehicle. Judge Buchanan delineated the proper analysis under the facts of the case at bar. *Williams* v. *State* (1973), 299 N. E. 2d 882, 888 (Buchanan, P.J., dissenting). Therefore, I adopt his opinion as my own and reproduce it here as a correct interpretation of *Luckett* v. *State* (1972), 259 Ind. 174, 284 N. E. 2d 738:

\* \* \*

"In order to determine whether there was a justifiable investigative detention a more complete statement of the facts is necessary:

"*RESTATEMENT OF ESSENTIAL FACTS*

"On the night in question, Indiana State Police Sergeant Cox and Trooper Fox were on routine patrol duty when they received a radio dispatch at 10:02 P.M., informing them that an armed robbery had been committed at the King's Crown Motel in West Lafayette, Indiana, seven minutes prior to the broadcast. This report described the suspects as two Negroes, both about six feet tall. Shortly thereafter, a second report was received indicating that the suspects' car (which remained undescribed) may have traveled northwest.

"At the time of these dispatches, the officers were located on State Road 18, four miles east of U.S. Highway 231, and fifteen miles northwest of the scene of the crime. Knowing Highway 231 to be a major link-up between Highway 52 and Interstate 65 (the most direct route to Chicago), the officers proceeded directly to the intersection of Highways 18 and 231 in order to observe northbound traffic on Highway 231.

"Upon arrival at the intersection, approximately three minutes later, the officers parked their patrol car and observed traffic which, according to Trooper Fox's testimony, was unusually light for that time of day. Two to four minutes elapsed, during which time the officer observed two automobiles traveling north. When a third car came by, driven by Appellant Williams, the officers suspected the driver was a Negro.

"At this time, the officers had been able to calculate from their knowledge of speed limits, road conditions, elapsed time and distances, that if the fleeing suspects were traveling northwest in the most direct route to Chicago, they could be observed at just this point.

"Sergeant Cox testified to this fact as follows:

" 'We knew that a crime had been committed. We knew from the time element that the individual we were looking for had time to be about this location at about this time.'

"Acting upon this information the officers decided to follow the automobile driven by Appellant Williams, and while doing so clocked its speed at approximately seventy miles per hour which was violative of the sixty-five mile per hour limit in that zone.

"After receiving a third radio dispatch stating that one subject had used a sawed-off shotgun or pistol in the robbery, the officers overtook and passed the vehicle in an effort to get a better look at the occupant, which efforts were unsuccessful due to the darkness. The officers then proceeded a short distance to a second intersection located on the south edge of Wolcott, Indiana, where they parked in a service station drive. When the automobile came to a stop at this intersection, the officers took advantage of the improved lighting conditions to observe the occupant and one officer became certain that he was a Negro, although the other entertained some doubt.

"They then stopped the automobile at the side of the road. While asking Appellant Williams for his driver's license,

Trooper Fox looked into the car with his flashlight and saw Appellant Rogers lying in the back seat. Sergeant Cox discovered a sawed-off shotgun located on the front floor of the car in open view. These observations led the police officers to place the Appellants under arrest for armed robbery and to seize the incriminating evidence used at trial. (The appellants were later positively identified as the robbers by employees of the Motel.)

\* \* \*

"The Indiana statute which gives 'stop and frisk' powers to law enforcement officers reads:

" '9-1048. Officer's duty to interrogate persons in public place — Limitations — Exemption from civil liability.— When a law enforcement officer in a distinctive uniform, or in plain clothes after having identified himself as a law enforcement officer *reasonably infers, from the observation of unusual conduct under the circumstances* and in light of his experience, *that criminal activity has been, is being,* or is about to be *committed by any person, observed in a public place said officer may stop such person for a reasonable period of time and may make reasonable inquiries* concerning the name and address of such person and an explanation of his action. Said stopping and inquiry shall be limited to those matters under the enforcement jurisdiction of the particular officer *and when conducted within the limits specified herein shall not constitute official custody or arrest* and shall not constitute grounds for civil liability for false arrest or false imprisonment. (Emphasis supplied.)

" '9-1049. Search of outer clothing—Disposition of weapons found.—When a law enforcement officer has stopped a person for temporary questioning pursuant to the preceding section and he further reasonably concludes in light of his experience that the person with whom he is dealing may be armed and presently dangerous, he shall be entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such person in an attempt to discover weapons which might be used to assault him. If the officer discovers a weapon he may seize it and if it is unlawfully possessed, said weapon shall be held for evidence in the prosecution of the appropriate criminal charge. If such person is not arrested and charged, said weapon shall be returned to him.

" '9-1050. Act supplemental. — *This act* [§§*9-1048—9-1050*] *shall be construed as supplemental to and not in*

*limitation of any power or authority granted to law
enforcement officers by other statutes or by the common
law.'* (Emphasis supplied.)

"I.C. 1971, §§ 35-3-1-1 to 35-3-1-3, Ind. Ann. Stat. §§ 9-
1048 to 9-1050 (Burns 1972 Suppl.)

" (These sections are hereafter collectively referred to as
the Statute and individually by section number.)

"The Statute was enacted in 1969 apparently in responce
to the U.S. Supreme Court's decision in *Terry* v. *State of
Ohio* (1968), 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889,
which definitively enunciated the constitutional validity of
non-arrest police detentions. The detention in *Terry* re-
sulted solely from the one-the-spot observation of a police
officer of the suspicious conduct of the defendants.

"The Statute adopts the same concept. A stop is authorized
as a result of a police officer's 'observation of unusual
conduct' under the circumstances. It is not intended to
apply if the officer has prior knowledge of criminal ac-
tivity. Thus the majority misinterpret and misapply the
Statute by measuring the officer's conduct solely in terms
of observation of unusual conduct.

"Section 1050 expressly recognizes the limited application
of §§ 1048 and 1049 by stating the Statute is supplemental
to and not in limitation of other statutes or the common law.

"The same limitation was implicitly recognized by our
Supreme Court in *Luckett* v. *State, supra,* which involved
similar facts and significantly omitted any reference to the
Statute. Furthermore, the Court found a stop, or investiga-
tive detention, was justified if reasonable under the cir-
cumstances and did *not* utilize the probable cause test as
was mistakenly done by the majority in the case before us.

"*Luckett* merits closer scrutiny. A police officer received a
radio dispatch alerting him to a recent burglary. The
broadcast described the vehicle as a Chevrolet and gave its
license plate prefix and described some of the stolen prop-
erty. The officer subsequently observed an automobile which
fit the description except for the make (Oldsmobile). The
driver was stopped and requested by the officer to produce
his operator's license. At this time the officer, using a flash-
light, observed some of the stolen goods in plain view in
the back seat, whereupon the vehicle's occupants were
placed under arrest.

"The court found the officer's conduct a justifiable detention
even though he did not have probable cause to 'formally
arrest' the automobile's occupants:

" 'However, this case involves the flight of suspected felons, and Officer Jackson was placed in a position where he had to choose between immediate action on one hand and restraint on the other. Efficient and effective law enforcement, in which there is a strong governmental interest, can best be accomplished by immediate action such as that taken by Officer Jackson in the instant case. It appears to be well settled that *there is nothing automatically unconstitutional in subjecting citizens to a brief detention under circumstances where probable cause for a formal arrest is lacking.*' (Original emphasis as to the word 'automatically' only.) *Luckett, supra,* at 741.

"In *Luckett,* the court clearly distinguished between '*detention*' and '*arrest*' in an automobile-stop transaction recognizing that a reasonable detention may ripen into an arrest:

" 'Upon reaching the car, Jackson, who was rightfully positioned, shined his flashlight inside where he observed the case of wristwatches which had been placed on the back seat. *At this time, the suspects were placed under formal arrest, thus ending the period of brief detention. The reasonableness of an investigation conducted during a period of brief detention* where probable cause for a formal arrest is lacking is a matter which will have to be determined on a case by case basis. Under the facts of the case at bar, we hold that the *investigation was reasonably conducted* and that no constitutional violation occurred. Furthermore, we are of the opinion that when Jackson observed the wristwatches *he then had probable cause* to arrest [sic] the appellant.' (Emphasis supplied.) *Luckett, supra,* at 743.

"In formulating the standard of 'reasonableness,' Justice Hunter speaking for a unanimous court did not refer to the Statute, or its requirement of 'unusual conduct.'

"It would seem, then, logically enough, that two standards exist by which the legality of non-arrest detentions may be measured. The standard of 'unusual conduct' which should be employed per the Statute in cases where the intrusion is founded upon on-the-scene observations and the *Luckett* test, applicable to situations, as here, where police conduct is based upon independent knowledge and circumstances apart from such observations. This is consistent with § 1050 of the Statute, *Terry* v. *State of Ohio, supra,* and recent enlargements of the *Terry* rule by the U.S. Supreme Court. *See, e.g., Adams, Warden* v. *Williams* (1972), 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612.

"Were it not so police officers, with prior knowledge of criminal activity could only detain moving vehicles if probable cause was present or for observation of unusual conduct.

"Other Indiana cases relied upon by the majority in support of its position that an arrest occurs whenever a vehicle is stopped dealt with situations in which probable cause was found to exist in the first instance. *Lynch* v. *State* (1972), 258 Ind. 284, 280 N. E. 2d 821; *Paxton* v. *State* (1970), 255 Ind. 264, 263 N. E. 2d 636; *Patterson* v. *State* (1970), 253 Ind. 499, 255 N. E. 2d 520.

"They are not pertinent to the inquiry of justifiable investigative detention.

"As many foreign jurisdictions recognize, compelling reasons exist for permitting a police officer to stop and briefly detain a motor vehicle absent probable cause. *See, e.g., United States* v. *Miller* (10th Cir. 1971), 452 F. 2d 731, cert. denied, 407 U.S. 926; *United States* v. *Catalano* (7th Cir. 1971), 450 F. 2d 985, cert. denied, 405 U.S. 928; *Carpenter* v. *Sigler* (8th Cir. 1969), 419 F. 2d 169; *United States* v. *Gazaway* (N. D. Ga. 1969), 297 F. Supp. 67; *Bramlette* v. *Superior Court of Merced County* (1969), 273 Cal. App. 2d 799, 78 Cal. Rptr. 532; *Palmore* v. *United States* (D. C. Ct. of App. 1972), 290 A. 2d 573, footnote 24 at 583 (U.S. appeal pending).

"Ours is a nation on wheels and the frequent use of the automobile in the commission of crime often places police officers in emergency situations requiring immediate action. *Luckett* v. *State.* They have a limited range of responses. Do nothing, allow escape, and risk violence visited upon the public by fleeing criminals. Continued surveillance may also be possible, but is unacceptable if suspects are thought to be armed. Resort to 'arrest' is also an alternative, but only *if* the officers do indeed possess enough information to constitute probable cause in a technical sense.

"The only effective alternative in many instances involving suspects in moving vehicles is direct action half way between inaction and arrest, *i.e.*, investigative detention reasonable [sic] conducted under the circumstances. The recognized governmental interest in apprehension of criminals demands such investigative stops: *Ballou* v. *Commonwealth of Massachusetts* (1st Cir. 1968), 403 F. 2d 982, *cert. denied.* 394 U.S. 909, 89 S. Ct. 1024; See also: *United States* v. *Edwards* (5th Cir. 1972), 469 F. 2d 1362; *United States* v. *Catalano, supra; Cox* v. *United States* (D. C. Ct. of App. 1969), 256 A. 2d 917; *W. LaFave,* 'Street Encounters' and the Constitution: Terry, Sibron, Peters and Beyond, 67

MICH. L. REV. 40 (1968) ; Note, 41 S. CAL. L. REV. 161 (1967).

\* \* \*

"According to Luckett an investigative detention of a moving vehicle is justifiable if 'the facts known . . . at the time he [the police officer] stopped the car were sufficient to warrant a man of reasonable caution in the belief that an investigation was appropriate.'

"Various factors determine reasonableness of the stop.

"Location of the vehicle within the range of possible flight is one. If the vehicle is observed within the span of time reasonably required to travel from the scene of the crime to the point of observation a stop may be justified even if the officers received a description of the car which was at variance with the vehicle observed. *Luckett* v. *State, supra; Cox* v. *United States, supra; Bailey* v. *United States* (D. C. Cir. 1967), 389 F. 2d 305.

"Likewise flight of a vehicle from the scene of the crime along a logical escape route may be another factor in determining reasonableness. *Coleman* v. *United States* (D. C. Cir. 1969), 420 F. 2d 616.

"The necessity of rapid response in an emergency to avoid escape by the suspects should be considered. *See, e.g., Luckett* v. *State, supra; United States* v. *Edwards, supra; United States* v. *Catalano, supra; Coleman* v. *United States, supra; Carpenter* v. *Sigler, supra; Ballou* v. *Commonwealth of Massachusetts, supra.*

"Lack of visibility due to darkness may tend to justify temporary detention : *Carpenter* v. *Sigler, supra; Bramlette* v. *Superior Court of Merced County, supra; People* v. *Henze* (1967), 253 Cal. App. 2d 986, 61 Cal. Rptr. 545.

"Lack of or inaccurate description does not destroy reasonableness of the stop: *Luckett* v. *State, supra* (different model) ; *United States* v. *Edwards, supra; Cox* v. *United States, supra* (different color).

"In the fact situation under consideration the combination of these factors adds up to a reasonable stop. The location of the stopped vehicle was within the range of possible flight. In fact the juxtaposition of time and distance between the patrol car and the appellant's auto as calculated by the officers, pinpointed the exact meeting place of the two vehicles on Road 231, the most logical escape route northwest of West Lafayette—and the most direct route in a northwesterly direction to Chicago. It was dark. The suspects were known to be two Negroes—one was observed

in a vehicle traveling in excess of the legal speed limit. Even though immediate action was necessary, the auto was trailed and the occupant observed for more accurate identification.

"Unlike *Luckett* in which the officers had the color of the automobile, three digits of the license plate prefix, and three suspects appearing in the car, there nevertheless was a coalescence of circumstances sufficient to reasonably justify *investigative detention* of appellant's vehicle. The actions of these police officers was proper and reasonable police action—witnessed by the ripening of their temporary detention into arrest for probable cause when they observed the second suspect and a sawed-off shotgun out of sight in the rear of appellant's automobile.

"Two random samples are illustrative of investigative detentions held to be reasonable under less persuasive circumstances.

"In *Carpenter* v. *Sigler* (8th Cir. 1969), 419 F. 2d 169, the court upheld an investigative detention based upon *Terry*, looking at these meager facts:

 " 'It was an early morning hour in a small town where unidentified cars do not routinely travel at that time. The car had out of county license plates. There had been a series of burglaries in the town. During the period of surveillance by the officers the car moved very slowly past closed business establishments and pursued a rather erratic course through the streets of the town. These facts taken together all point to sufficient justification for stopping the Carpenter auto and requiring the occupants to identify themselves.'

"In *United States* v. *Jackson* (9th Cir. 1971), 448 F. 2d 963, police detention was upheld on facts bearing marked resemblance to those before us. City police officers were on routine patrol duty at 11:20 P.M. when they received a radio report that a store had been robbed. The report described the suspects as two Negro males and stated that they fled in an easterly direction. Being familiar with the area, the officers proceeded to an intersection which they calculated to be in the line of a possible escape route. Moments after reaching the intersection, the officers saw an automobile traveling south with three Negro males inside. After a short period of surveillance, the car was stopped by use of a flashing red light.

"Finding that the officers were faced with an emergency situation, that the third occupant in the vehicle could have

been a 'lookout' or driver during the commission of the crime and that the automobile in which the subjects were riding was headed in the direction of a Negro area of the city, the court held that the officers' actions were justifiable:

> " 'Under these facts *the officers acted reasonably* in stopping the Cadillac and questioning the occupants concerning their identity and residences. This was intelligent, effective police work. If police officers may not do what was done here, law enforcement would be seriously crippled. The Fourth Amendment was not intended to handcuff the police in their reasonable effort to handcuff criminals. [Citations omitted.]' 448 F. 2d, at 970. (Emphasis supplied.)

"Whether the stopping of a moving vehicle for investigative purposes under appropriate circumstances is denominated an 'arrest', a 'preliminary arrest', or whatever, the urgent need for investigative detention exists. Furthermore, such stops are legally justifiable by Indiana, federal, and sister state cases. To draw fine lines as to what constitutes an 'arrest' in these circumstances is to engage in stultifying semantics.

"The decision of the learned trial judge should be affirmed."

(Footnotes omitted)

### DISSENTING OPINION

DEBRULER, J.—The stop and detention of the appellants by the police while driving in a car constitutes a seizure within the contemplation of that term in the Fourth Amendment to the United States Constitution. As such it must meet the Fourth Amendment requirement of reasonableness. *Terry* v. *Ohio* (1968), 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889; *Smithers* v. *State* (1971), 256 Ind. 512, 269 N. E. 2d 874. General principles exist to guide us in making this judicial determination of reasonableness. In so doing it is well to recall that it is our function as judges to enforce the compact and thereby to preserve its values. It is the duty of a judge to align himself with those principles and values, and then apply the principles to the case before him. The need to adhere to this basic stance in consideration of Fourth Amendment issues is well explained in *Coolidge* v. *New Hampshire* (1970), 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564:

"In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing every man's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important." 403 U.S. at 455. .

The Supreme Court of the United States stated the specific standard for evaluating the reasonableness of a police officer's action in effecting a personal seizure which falls short of an arrest, that is, "Would the facts available to the officer at the moment of the seizure 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry* v. *Ohio, supra.* Since the State did not have a warrant, the burden was upon it at the hearing on the motion to suppress, to establish that the police were justified in stopping the car and that the subsequent seizure of the shotgun from the car was not in violation of the Fourth Amednment. *Smithers* v. *State, supra.* The trial court specifically found in this case that the stop of the car in which appellants were driving, and the subsequent removal of them at gunpoint was justified, relying upon *Terry* v. *Ohio, supra.* The subsequent view of the shotgun by the officer through the car door left open by one of the appellants upon alighting, was therefore in the opinion of the trial court properly seized and admissible in evidence.

In my view, the trial court correctly found the facts, known to the officers at the moment they pulled appellants' car over, but that the trial court erred in determining that these facts justified them in stopping the car. The trial court should have suppressed the physical evidence taken from the car, and such other evidence coming into the possession and knowledge of the police as a direct result of the illegal stop of the appellants.

The officers who stopped the car testified that they knew the following facts, and further that it was the following facts upon which they relied in making the decision to stop the car and its occupants:

(1) The Kings Crown Motel located on the Highway 52 by-pass in West Lafayette, Indiana was robbed at 9:55 p.m. by two Negro males, one armed with a sawed-off shotgun.

(2) The two Negro suspects were believed to be heading north on Highway 52 in a car.

(3) A single Negro male was seen by the stopping officers driving north in a car on State Road 53 away from the general direction of West Lafayette at a point fifteen miles from the Kings Crown Motel, about eighteen minutes after the robbery.

The officers, executing the seizure, first learned of the robbery by police car radio, while located six miles west and nine miles north of the Kings Crown Motel. They were at that time on State Road 18 in an adjoining county. They proceeded to the junction of State Road 18 and State Road 53, which junction is fifteen miles from the Kings Crown Motel. It was while waiting at this junction that the officers first observed appellants' car and began following it. State Road 53 was described by one of the officers as a two lane highway running in a northerly direction. Appellant was stopped by the officers in the village of Wolcott which is situated along this highway. It is important to note here that the appellants' vehicle was headed north on Highway 53 and not north on 52 as was indicated in the message. The record shows that Highway 52 runs in a general northwest direction toward Chicago, and intersects near West Lafayette with Highway 53, which runs in a northerly direction. It is therefore apparent that Highway 53 becomes just one of several roads which would provide egress to a person travelling in a northerly or north-westerly direction from West Lafayette, Indiana.

Immediately prior to the time of the stop of the car in which appellants were travelling, the police officers observed only that a lone Black male was driving a car travelling in

the same general compass direction as had been reported, and that given the robbery and flight by car at 9:55 p.m. from the Kings Crown Motel, such escape car leaving the Kings Crown Motel at 9:55 p.m. might reasonably reach a point fifteen miles away in eighteen minutes.

The officers had no description of any sort of the type or color of the car believed to be carrying the suspects north on Highway 52. The suspects were described by message only as two Black males. Both officers testified that they relied upon their experience and the facts that a person whom they thought might be a Black male was headed in a northerly direction away from West Lafayette in a car, which when observed, was about eighteen minutes from the motel. One of the officers was unable to decide what the apparent race of the driver was. There was no more accurate description of the suspects upon which the officer relied in making the stop. And they had no accurate description of the road upon which the car was travelling. Road 53 is merely one of the possible routes which the suspects might possibly take when fleeing north. Recapping, then, there was no accurate description of the suspects, the car, or the road upon which they were travelling. Under these circumstances I would hold that the trial court erred in sustaining the constitutionality of the seizure of appellants and in adjudging that the evidence seized as a direct result thereof from the car was admissible against appellants. I would therefore order a new trial.

The error made by the majority here, is its failure to recognize that this case is distinguished from *Terry* and the related cases following it. The exercise by police of the authority to forcibly detain and question persons on less than probable cause, has only been granted where the facts known to the officer, establish that suspicious conduct or criminal conduct has occurred, *and also* identify the person so conducting himself. Where, as here, the police officer does not observe the conduct, the identifying facts must be particularized and clearly point out the person to be detained.

In *Terry,* Officer McFadden personally observed the suspicious conduct of John Terry. In *Smithers,* the officers saw how the defendants looked, and observed their conduct. In *Adams* v. *Williams* (1972), 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612, Robert Williams was physically pointed out to Sgt. Connolly on the street, and Sgt. Connolly immediately walked over and confronted him. In *Luckett* v. *State* (1972), 259 Ind. 174, 284 N. E. 2d 738, we found justification for a stop of individuals in a car in an aggregation of circumstantial evidence, including a license number prefix and color of car. *Luckett* teeters precariously on the brink of unconstitutionality. To me *Luckett* marks the final outer limits of the zone of permissible detention, questioning, and searching permitted to be carried on by agents of the State without probable cause. The majority in *Adams,* perceived the requirement of a particularized description of the suspected person when they suggest that an investigatory detention is warranted when the victim of a street crime seeks the aid of a policeman and gives a *description* of the assailant. In the cases of *Gaines* v. *Craven,* 448 F. 2d 1236 (9th Cir., 1971), and *U.S.* v. *Unverzagt,* 424 F. 2d 396 (8th Cir., 1970), relied upon heavily by the *Adams* majority, the identifying facts unquestionably focused upon the persons detained.

Finally, the *Terry* rule has been held inappropriate in hypothetical circumstances such as those described in the majority opinion. In *Davis* v. *Mississippi* (1969), 394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676, the U.S. Supreme Court condemned as illegal, the type of indiscriminate dragnetting by police officers which the majority of this Court now sanctions. That court in condemning the use of investigatory dragnets appropriately and wisely adjudged that such group seizures:

> "would subject unlimited numbers of innocent persons to the harrassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these in-

trusions be termed 'arrests' or investigatory detentions'." 394 U.S. at 726-727.

Without intending to detract to any degree from the very serious nature of the issues involved in this case, I would state my own presumption. It is that the type of unwarranted intrusion upon the Fourth Amendment rights of Indiana citizenry sanctioned by the majority today will survive only until the first time in a large department store during the Christmas rush, it is announced over the loudspeaker system:

> "Ladies and Gentlemen: The jewelry department has just been robbed by a white male. No one will be permitted to leave or enter the store. All white males now in the store will please go and line up at the rear wall of the basement level. You will then face the wall and lean up against it with both hands, at a forty-five degree angle, and spread your feet wide apart. You will then await a police officer, who will pat you down and take your name, address, age, place of employment, and social security number. You will then be permitted to leave."

I therefore dissent.

NOTE.—Reported in 307 N. E. 2d 457.