**Michael Paul ARCURI, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 45A03–0110–CR–317.**

Court of Appeals of Indiana.

Aug. 13, 2002.

Publication Ordered Sept. 20, 2002.

Mark A. Bates Appellate Public Defender, Crown Point, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Grant H. Carlton, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Michael Arcuri ("Arcuri") appeals from the Superior Court of Lake County's denial of his Motion to Suppress. In this appeal, Arcuri raises the following two issues:

I. Whether the trial court erred when it determined that the investigative stop of the vehicle in which Arcuri was a passenger was supported by a reasonable suspicion; and,

II. Whether the trial court abused its discretion when it determined that a warrantless search of a residence in which Arcuri claimed to live was constitutional.

We affirm.

### Facts and Procedural History

The facts most favorable to the trial court's ruling show that at approximately 8:30 p.m. on March 18, 2001, an armed man wearing a ski mask and a hooded, gray sweatshirt robbed a Speedway gas station in Highland, Indiana. The gas station attendant described the robber to the emergency call dispatcher as being about five foot three inches to five foot four inches, wearing a hooded, gray sweatshirt and a ski mask, and carrying a semi-automatic silver revolver. Tr. pp. 3, 4.[1]

Officer Michael James O'Donnell of the Highland Police Department was on patrol

---

1. This citation format refers to the Transcript of the Audiocassette Tape. Any citations to

when the robbery information and the robber's description were dispatched. Because of the direction in which the dispatcher said the robber fled, Officer O'Donnell drove his patrol car onto a bicycle path that he believed could have been an easy route for a fleeing robber. In the meantime, other Highland police officers arrived at the gas station and gathered more information from the attendant. At this point, the attendant informed the officers that the robber had an accent. The police at the scene radioed this additional information to Officer O'Donnell. Appellee's App. p. 98.[2]

After receiving the latest radioed information, Officer O'Donnell pulled out onto a road that intersected the bicycle path and up to a stop sign about two blocks from the Speedway gas station. As his vehicle approached the stop sign, a motor vehicle turned in front of him, away from the direction of the gas station. Officer O'Donnell noticed that the passenger in the vehicle was very short, Hispanic and seemed to be slouching down in the front passenger seat evasively when the vehicle passed his patrol car. *Id.* at 25, 28. Officer O'Donnell then turned his car around and stopped the motor vehicle. About five minutes had lapsed since Officer O'Donnell received the first dispatch call. *Id.* at 47.

Officer O'Donnell first spoke with the driver of the motor vehicle, who informed the officer that they had just come from the passenger's residence. *Id.* at 53. Officer O'Donnell then spoke with the passenger, Arcuri, and determined that he had an Hispanic accent and a slight lisp. *Id.* at

26. When Arcuri exited the motor vehicle, Officer O'Donnell confirmed that Arcuri was very short. *Id.* at 52. After another officer arrived at the traffic stop, both the driver and Arcuri were taken into custody. After placing Arcuri into his patrol car, Officer O'Donnell Mirandized him. As Officer O'Donnell was transporting Arcuri back to the Speedway gas station, he asked Arcuri where he lived. Arcuri pointed to a house, the owner of which Officer O'Donnell happened to know. *Id.* at 32. Once at the Speedway gas station, Arcuri was moved from Officer O'Donnell's patrol car to another officer's car in order to be transported to the police station.

While Arcuri was being transported to the police station, Officer O'Donnell visited the residence in which Arcuri said he lived. Officer O'Donnell had attended several years of school with the owner, Cathy Ferrell ("Ferrell"). He first spoke with Ferrell outside the residence and informed her that he was investigating an armed robbery and that Arcuri was a suspect. *Id.* at 48. Then he and Ferrell entered the home. Ferrell led Officer O'Donnell to a common area of the residence that was located just at the top of a stairway. He described the area as a "loft area" with a futon, chest of drawers, and clothing tossed about the floor. He said that the area did not have a door and that there was a room off to the side, which was the enclosed bedroom of Ferrell's son that did have a door. *Id.* at 51–52. A hooded, gray sweatshirt, a ski mask, black gloves, and a .380 semi-automatic handgun were recovered from the area. Appellant's App. p. 18.[3]

hearing transcript will be from either the Appellant's or Appellee's briefs.

**2.** The attendant's signed statement also included the facts that the robber spoke with an accent that she did not recognize and that his words were slurred. *Id.* at 73.

**3.** It is not clear from the Record at what point the evidence was seized from the Ferrell residence. The State's response to Arcuri's Motion to Suppress implies that Officer O'Donnell seized the evidence upon his first visit to the residence. However, O'Donnell testified that as soon as he walked into the common area and noticed the sweatshirt, he turned

At approximately 9:35 p.m. at the police station, Officer David Allen Calarie of the Highland Police Department, who was also at the Speedway station after the robbery, read a Miranda form to Arcuri for the purpose of advising him of his rights with regard to giving consent to search his living area in the residence at which he stayed. *Id.* at 112. Officer Calarie testified that he informed Arcuri that he was not required to sign the consent to search form, and that based upon the Miranda form that was read to Arcuri, Arcuri "truthfully signed the consent" form. *Id.* at 114. Officer Calarie also testified that he read the consent to search form to Arcuri, and Arcuri read it himself before he signed. *Id.* After Arcuri signed the consent to search form, Officer Calarie took the signed form to Officer O'Donnell at the Ferrell residence.

After reviewing arguments on Arcuri's Motion to Suppress, which was filed on June 14, 2001, the trial court denied the motion on August 8, 2001. The trial court then certified the ruling for interlocutory appeal, and this court accepted jurisdiction of the appeal on October 19, 2001. Additional facts will be provided as necessary.

## I. Standard of Review

Our standard of review when a motion to suppress has been denied is similar to our standard of review for claims of insufficient evidence to support a trial court determination. *Crabtree v. State*, 762 N.E.2d 241, 244 (Ind.Ct.App. 2002). We do not reweigh the evidence but if any evidence is in conflict, we only consider the evidence most favorable to the trial court's determination. *Id.* Additionally, we must also consider uncontested evidence favorable to the defendant. *Id.* (citing *Washington v. State*, 740 N.E.2d 1241, 1243 (Ind.Ct.App.2000), *trans. de-*

*nied*). Lastly, review of whether a police officer had a reasonable suspicion to conduct an investigatory stop is reviewed de novo. *Id.* (citing *Burkett v. State*, 736 N.E.2d 304, 306 (Ind.Ct.App.2000)).

## II. Investigatory Stop

Arcuri first argues that the trial court erred when it denied his Motion to Suppress because Officer O'Donnell did not have a reasonable suspicion to stop the vehicle in which Arcuri was a passenger. "An officer may stop and briefly detain an individual for investigatory purposes if, based upon specific and articulable facts, the officer has a reasonable suspicion of criminal activity even if the officer lacks probable cause to make an arrest." *Id.* at 245 (citing *Lockett v. State*, 747 N.E.2d 539, 544 (Ind.2001) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))). We employ a two-part test to determine whether an investigatory stop was reasonable: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Lockett*, 747 N.E.2d at 544 (quoting *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868)). "Based on the totality of the circumstances, the detaining officer must have a particularized and objective basis for suspecting ... criminal activity." *State v. Smith*, 638 N.E.2d 1353, 1355 (Ind.Ct.App. 1994) (citing *State v. Nesius*, 548 N.E.2d 1201, 1201 (Ind.Ct.App.1990)).

Arcuri argues that it was not enough that Officer O'Donnell made the stop based on the facts that Arcuri appeared to be short, appeared to be Hispanic, was evasive when the vehicle in which he was riding turned in front of Officer O'Don-

around and went back down the stairs. Appellee's App. p. 35. He also testified that he waited until he received Arcuri's signed con-

sent to search form before he returned to the common area of the home to retrieve the evidence. *Id.* at 36.

nell's patrol car, and was near the scene of the robbery. Other important facts not included in his argument, however, are that the car was only two blocks from the scene of the robbery, only about five to seven minutes had passed since the robbery, there were no other cars on the street at the time, and the fact that he appeared short and Hispanic fit the description Officer O'Donnell had received over his police radio. Appellee's App. pp. 22, 40, 47.

Arcuri relies heavily on Indiana cases such as *Burkett,* 736 N.E.2d at 306, in which a panel of this court held that the totality of the circumstances did not rise to a level of reasonable suspicion justifying an investigatory stop even though defendant was in a neighborhood known for drug dealing at a late hour, the defendant was wearing a hooded sweatshirt in seventy-six degree weather, the defendant turned and walked away from a police officer who had pulled his car up to the corner at which the defendant had been standing, and the defendant's race was the same as the group of men that had been reported as dealing narcotics in the area. Our case is dissimilar from *Burkett.*

Besides the fact that Arcuri fit the description of the robber, in the case at bar, the robbery was "freshly committed" and Officer O'Donnell believed he was in the area to which the robber was headed based upon the gas station attendant's account of the direction he headed. Under the totality of the facts and circumstances of this case and based upon "[t]he need for swift and effective law enforcement[,]" Officer O'Donnell's stop of the vehicle in which Arcuri was riding was not improper; rather, it was good police work. *Marsh v. State,* 477 N.E.2d 877, 878 (Ind.1985) (citing *Terry,* 392 U.S at 1, 88 S.Ct. 1868; *Williams v. State,* 261 Ind. 547, 307 N.E.2d 457 (1974)).

## III. Warrantless Search

■ Arcuri next argues that his consent to search the common area of the Ferrell residence was invalid, and therefore, the trial court erred when it denied his Motion to Suppress. He specifically argues that because he was not informed of his right to consult with counsel before signing the consent to search form, the manner in which his consent was obtained was unconstitutional.

The State counters that although neither the Miranda form nor the consent form were submitted into evidence and are therefore not part of the record, "it is reasonable to infer that [the Miranda form] may have done more than merely advise Arcuri of his general right to counsel for purposes of interrogation." Br. of Appellee at 6. The State also relies on Officer Calarie's testimony that even though he did not recall whether he informed Arcuri of his specific right to counsel prior to signing the form, he did in fact inform Arcuri that he did not have to consent to the search. *Id.* at 6–7 (citing Appellee's App. p. 114). In the alternative, the State argues that regardless of whether Arcuri's consent was valid, the police officers had the valid consent of Ferrell, the owner of the home, who had the authority to consent to the search of the common area in her residence.

At the outset, we note that the record is devoid of any of the trial court's reasons for denying Arcuri's Motion to Suppress. Therefore, we can only speculate as to whether the trial court found that Arcuri lacked standing to complain of the search, that Ferrell consented to the search, or that Arcuri's consent was valid, all of which were issues raised before the trial court. Logically, our initial inquiry is whether Arcuri had standing to argue that the search of the common area in the

Ferrell residence was unconstitutional. We hold that he did not.

 The Fourth Amendment protects people from unreasonable searches and seizures, and this protection has been extended to the states through the Fourteenth Amendment. *Brown v. State*, 691 N.E.2d 438, 443 (Ind.1998) (citation omitted). A defendant must have a legitimate expectation of privacy in the premises that is the subject of the search before he can challenge the search as unconstitutional. *Id.* (citing *Peterson v. State*, 674 N.E.2d 528, 532 (Ind.1996) (quoting *Livingston v. State*, 542 N.E.2d 192, 194 (Ind.1989))). To determine if a defendant has an expectation of privacy we look to whether the defendant had control over or ownership in the searched premises. *Id.* (citing *Peterson*, 674 N.E.2d at 532 (citations omitted)). When the constitutionality of a search is challenged, the burden of proving that a legitimate expectation of privacy in the area searched falls upon the defendant. *Id.* (citing *Peterson*, 674 N.E.2d at 532 (citing *Livingston*, 542 N.E.2d at 194)).

Our review of the record leaves us guessing as to the nature of Arcuri's living arrangements in the Ferrell residence. From the evidence, we know that Arcuri pointed to the Ferrell residence in response to Officer O'Donnell's question about where he lived. We also know that when Officer O'Donnell went to the Ferrell residence, he spoke with Cathy Ferrell, the owner of the residence. While speaking outside the residence, Officer O'Donnell explained to Ferrell that he was investigating an armed robbery, for which Arcuri was a suspect, and that Arcuri had pointed out Ferrell's house as his residence. Ferrell then led Officer O'Donnell into the residence and to a common area that contained a futon, a chest of drawers, and had clothing tossed about the floor. It was in that common area that Officer O'Donnell eventually seized a hooded, gray sweatshirt, a ski mask, black gloves, and a .380 semi-automatic handgun.

After the State argued that Arcuri did not have standing to complain of the search because he had no reasonable expectation of privacy in the common area of Ferrell's residence, Arcuri had the burden to show that he did in fact have an expectation of privacy in the common area of Ferrell's residence. Arcuri presented no evidence that he had exclusive control or ownership in the common area. *See id.* (citing *Peterson*, 674 N.E.2d at 532 (citations omitted)). Additionally, the common area was not enclosed and there was no door through which someone would have to pass to enter the area. This evidence, although scant, is uncontradicted. Because Arcuri lacked standing to challenge the search, we conclude that the trial court did not abuse its discretion when it denied Arcuri's Motion to Suppress the evidence seized from the Ferrell residence.

## IV. Conclusion

Because we conclude that the investigatory stop of the vehicle in which Arcuri was a passenger was supported by reasonable suspicion, and because the trial court did not abuse its discretion when it determined that the search of the Ferrell residence was constitutional, we affirm the trial court's ruling denying Arcuri's motion to suppress.

Affirmed.

BARNES, and KIRSCH, JJ., concur.

## ORDER TO PUBLISH MEMORANDUM DECISION

Comes now this Court having issued upon Appellee's motion an Order to Show Cause Why Memorandum Decision Should Not be Published now finds:

1. That this court's order allowed Appellant twenty (20) days in which to

show cause why the Memorandum Decision should not be published.

2. That Appellant failed to respond to this court's motion, and as a result failed to show cause within the required time period why the Memorandum Decision should not be published.

Having failed to receive any cause preventing publication, this court hereby GRANTS the Appellee's Motion for Publication of Unpublished Memorandum Decision.

It is therefore ORDERED that the Memorandum Decision handed down by this court in the above-captioned matter on August 13, 2002, be published and it shall be so ordered.