Christopher M. MATSON,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 64A04–0508–CR–438.

Court of Appeals of Indiana.

March 30, 2006.

Transfer Denied June 13, 2006.

Susan K. Carpenter, Public Defender of Indiana, J. Michael Sauer, Deputy Public Defender, Indianapolis, for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

KIRSCH, Chief Judge.

Christopher M. Matson was convicted of murder[1] and adjudged to be a habitual offender[2] after a jury trial and was sentenced to a total of ninety-five years. He appeals, raising one issue, which we restate as whether the trial court abused its discretion when it admitted evidence obtained as a result of a warrantless search and seizure of Matson's belongings.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On May 28, 2000, Richard Pinkerton was shot and killed at his home in Chesterton, Indiana. It was later determined that Pinkerton was shot with a .45 caliber handgun. During the investigation of this murder, the police began to suspect Matson as the shooter. Matson had previously lived

1. *See* IC 35–42–1–1.

2. *See* IC 35–50–2–8.

in Indiana, but had moved to Las Vegas in 1998 or 1999. He had been back in Indiana visiting friends and family at the time of the murder and returned to Las Vegas a few days after Pinkerton's murder.

Shortly after returning to Las Vegas, Matson learned through relatives that the police wanted to talk to him in connection with a murder case. He then called his ex-wife, Elizabeth Silva, who lived in Arizona and asked her if he could bring his cats to her. Matson drove to Silva's residence and told her that he was in trouble and that he wanted her to take care of his cats for a few weeks. He then drove back to Las Vegas to get two more cats. When he returned to Arizona, Matson stayed with Silva off and on for several days. He told her that he wanted to sell his car, a tan Ford Crown Victoria, and asked permission to store some items in her trailer. Silva initially refused, but later relented and allowed Matson to put his belongings under her trailer. She gave him some plastic garbage bags to protect the items from weather conditions, and on June 14, 2000, Matson placed his things under the trailer with the understanding that he would remove them after a short period of time. He then left in his car.

Later that same day, FBI Agent W. James Gretz and another officer went to Silva's trailer to speak to her about Matson. While the officers were there, Silva told them that Matson had placed some of his belongings under her trailer and pointed out the location of these items. She then requested that the officers remove the items because she did not want them there. The officers did not take the items at that time because Matson was expected to return to Silva's trailer sometime, and they did not want to alert him that they had been there. As the officers drove away, they saw a tan Ford Crown Victoria,

matching the description of Matson's car, driving in the direction of Silva's trailer. The white male driving the car matched Matson's description. Upon seeing Matson, the officers turned their cars around to follow, but lost sight of him in the process. The officers proceeded to Silva's trailer and learned that Matson had left his car there and had disappeared on foot after informing Silva that the police were after him.

Agent Gretz and many other officers searched for Matson in the area near Silva's trailer that night. After searching for several hours and concluding that it was unlikely that they would find Matson that night, Agent Gretz asked Silva if she was still willing to give the officers permission to remove the items under her trailer that belonged to Matson. Silva again granted them permission to take the items. At that point, several officer began removing the items and placing them inside of Matson's car. Under the trailer, the officers saw several plastic garbage bags, a couple of cardboard boxes, and a brown, vinyl tote bag. When Officer James Koubeck grabbed the tote bag, it was unzipped and he observed what appeared to be a .45 caliber semi-automatic handgun. After removing all of the items from under the trailer, the officers drove Matson's car, which contained the items, to an FBI office in Flagstaff, Arizona.

Two days later, the officers obtained a search warrant and searched the items from underneath the trailer including the tote bag. Inside the tote bag, the officers found a .45 caliber handgun, which was later determined to be the weapon used to kill Pinkerton, and a box of .45 caliber ammunition. Matson was arrested on June 16, 2000, at a location approximately fifty miles from Silva's trailer.

Matson was charged with murder and with being a habitual offender. Matson

filed a motion to suppress the evidence found under Silva's trailer on April 6, 2001. After a hearing, the trial court denied Matson's motion. A jury trial was held, and the jury found Matson guilty of murder and found him to be a habitual offender. The trial court sentenced Matson to serve sixty-five years for murder and enhanced that sentence by thirty years for the habitual offender finding, for a total of ninety-five years. Matson now appeals.

## DISCUSSION AND DECISION

The admissibility of evidence is within the sound discretion of the trial court and will not be disturbed without a showing of an abuse of that discretion. *Wright v. State,* 766 N.E.2d 1223, 1229 (Ind.Ct.App.2002). Our review of a denial of a motion to suppress is similar to our review of other sufficiency matters. *Id.* (citing *Goodner v. State,* 714 N.E.2d 638, 641 (Ind.1999)). Matson also made a contemporaneous objection to the admission of the evidence at trial. We review the ruling for substantial evidence of probative value to support the trial court. *Alford v. State,* 699 N.E.2d 247, 250 (Ind.1998). We examine the evidence most favorable to the ruling along with any uncontradicted evidence. *Wright,* 766 N.E.2d at 1229. We do not reweigh evidence or judge witness credibility. *Id.*

### I. Fourth Amendment

The Fourth Amendment protects persons from unreasonable search and seizure, and this protection has been extended to the states through the Fourteenth Amendment. U.S. Const. amend. IV; *Krise v. State,* 746 N.E.2d 957, 961 (Ind. 2001). Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Halsema v. State,* 823 N.E.2d 668, 676 (Ind.2005). When a search or seizure is conducted without a warrant, the State bears the burden of proving that an exception to the warrant requirement existed at the time of the search or seizure. *Id.*

Matson argues that the search and seizure of his property from under Silva's trailer was unreasonable under the Fourth Amendment and that the trial court abused its discretion by allowing the evidence to be admitted. The State contends that Matson lacks standing to contest the constitutionality of the search and seizure. A defendant must have a legitimate expectation of privacy in the premises that is the subject of the search before he can challenge the search as unconstitutional. *Arcuri v. State,* 775 N.E.2d 1095, 1100 (Ind.Ct.App.2002), *trans. denied.* "An expectation of privacy gives rise to Fourth Amendment protection where the defendant had an actual or subjective expectation of privacy and the claimed expectation is one which society recognizes." *Krise,* 746 N.E.2d at 969. When the constitutionality of a search is challenged, defendant has the burden of demonstrating a legitimate expectation of privacy in the premises searched. *Arcuri,* 775 N.E.2d at 1100. An overnight guest has a legitimate expectation of privacy in his host's home and may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the owner of the premises may not. *Minnesota v. Olson,* 495 U.S. 91, 98, 110 S.Ct. 1684, 1688, 109 L.Ed.2d 85 (1990); *Hanna v. State,* 726 N.E.2d 384, 390 n. 4 (Ind.Ct.App.2000).

Here, Matson had not previously visited Silva's trailer prior to calling her to take care of his cats. Likewise, prior to the removal of the items, he had only stayed with Silva off and on for several days. There was no evidence that Matson intended to stay with Silva any longer or that he was staying there on the evening the police came to Silva's trailer. Matson asked Sil-

va if he could store some of his belongings in her trailer while he went to sell his car. Although Silva initially refused, she later allowed Matson to store some of his things under her trailer with the understanding that he would only keep the items there for a short period of time. He then told Silva he was leaving to sell his car. When the police spoke to Silva, she gave them permission to remove Matson's things from under her trailer. She also told the officers that some of her belongings were also under the trailer. Matson has presented no evidence that he had exclusive control or ownership over the common area under the trailer. We therefore conclude that Matson was not an overnight guest and that his belongings were merely under Silva's trailer with her consent. Therefore, he had no expectation of privacy in the area under the trailer, and the police entered that area with the consent of Silva, the owner.

▆▆▆▆ Although Matson did not have an expectation of privacy in the area under the trailer, we do find that he had an expectation of privacy as to the contents of the closed containers that he placed under the trailer, and any search of the inside of the containers was subject to the warrant requirement. Here, as the officers removed Matson's belongings from underneath the trailer, Officer Koubeck pulled the tote bag out and because it was unzipped, he was able to see a handgun inside. At that point, the officers did not conduct any further investigation of the contents of the tote bag. They took all of the items to an FBI office, and after obtaining a search warrant, searched the items. The observation of the handgun in the tote bag was not a search because it was within "open view." "The concept of 'open view' is used in situations in which a law enforcement officer observes something from an area that is not constitutionally protected, but rather is in a place where the officer is lawfully entitled to be." *Kendall v. State*, 825 N.E.2d 439, 448–49 (Ind.Ct.App.2005). In these situations, anything that is within "open view" may be observed without obtaining a search warrant because such observations do not constitute a search in the constitutional sense. *Id.* at 449. However, in order to lawfully seize the item in "open view," it may be necessary to obtain a search warrant or be able to justify a warrantless seizure under an exception to the warrant requirement. *Justice v. State*, 765 N.E.2d 161, 165 (Ind.Ct.App.2002). When Officer Koubeck saw the handgun in the tote bag, he was in a place where he was lawfully entitled to be as explained above, and his observation of the handgun did not constitute a search. The search did not occur until a search warrant was obtained. Therefore, the trial court did not abuse its discretion in allowing the evidence under the Fourth Amendment.

## II. Indiana Constitution [3]

▆▆▆▆ Matson additionally argues that the search and seizure of his property was unreasonable under Article I, Section 11 of the Indiana Constitution. Under the Indiana Constitution, the legality of a governmental search turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind.2005). Our Supreme Court has explained reasonableness of a search or seizure as turning on a balance of: (1) the

---

**3.** The State argues in its brief that analysis under the Indiana Constitution is inappropriate because the search did not take place in Indiana and was not conducted by Indiana law enforcement officers. Because we hold that the search did not violate Indiana's constitutional protections, we do not reach the issue of its extraterritorial application.

degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.* at 361.

 Here, the officers went to Silva's trailer because a warrant had been issued for Matson's arrest on a probation violation and because they wanted to speak to him regarding Pinkerton's murder. The police suspected Matson to be involved in the murder because two pizza boxes were found at the scene with the name "Martinez" written on them. The police discovered that the pizzas had been ordered for a household where Matson was staying on the evening of the murder, that he had eaten pizza at that house that evening, and that he did not stay at the house after dinner. The police also knew that prior to the murder, a man was seen riding a bicycle and carrying two pizza boxes near the victim's home. Matson had a bicycle in his car during his trip to Indiana. The police further knew that Matson owned a .45 caliber handgun, which had previously belonged to his mother.

When the police initially went to Silva's trailer, she told them that Matson had been there, but had left to sell his car. She also told them that Matson had placed some of his belongings under her trailer with her permission, and she asked the police to remove these items. The officers did not take the items at that time because they did not want to tip off Matson that they had been there. As the officers were driving away, they saw Matson heading back toward the trailer in his car, so they followed him. When they arrived back at the trailer, they searched for Matson, but could not find him. Silva again gave them permission to take the items that Matson had placed under her trailer. As the officers removed the items, a handgun was observed inside of an open tote bag, but no further search was done until a search warrant was obtained. Under the totality of the circumstances, we conclude that the officers' conduct was reasonable and did not violate Article I, Section 11 of the Indiana Constitution.

Affirmed.

SULLIVAN, J., and DARDEN, J., concur.