## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 27 2018, 9:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Victoria L. Bailey
Marion County Public Defender
Indianapolis, Indiana

Kurt A. Young
Nashville, Indiana

Michael C. Borschel
Indianapolis, Indiana

Matthew D. Anglemeyer
Marion County Public Defender
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Plaintiff,*

v.

Deja Canady, Jamel Hoskin, and Anthony Harmon,

*Appellees-Defendants.*

August 27, 2018

Court of Appeals Case No.
49A02-1710-CR-2285

Appeal from the Marion Superior Court

The Honorable Marc T. Rothenberg, Judge

Trial Court Cause Nos.
49G02-1702-F3-5493
49G02-1702-F3-5492
49G02-1704-F3-13118

**Barnes, Senior Judge.**

# Case Summary

The State of Indiana appeals the trial court's grant of motions to suppress filed by Deja Canady, Jamel Hoskin, and Anthony Harmon. We affirm.

# Issue

The State raises one issue, which we restate as whether the trial court properly granted the motions to dismiss filed by the Defendants regarding whether the traffic stop violated the Fourth Amendment of the United States Constitution.

# Facts

On the evening of February 6, 2017, several robberies occurred in the area of the Spanish Oaks apartment complex and the Hacienda apartment complex in Indianapolis. This area of Indianapolis is a high crime district with the reputation of being one of the most violent districts in Indianapolis.

In the first incident, officers from the Indianapolis Metropolitan Police Department ("IMPD") were dispatched at approximately 8:00 p.m. to the Spanish Oaks apartment complex regarding an armed robbery. A couple told officers that, as they got out of their vehicle, they were approached by two black men wearing masks. One of the men had a gun, and they demanded money

and cell phones. They took money from the woman, and money and cash from the man. The woman pulled a mask off one of the men and saw curly hair.

[5] While officers were at the scene of the first robbery, they received a dispatch to a second location in the same apartment complex at approximately 8:23 p.m. A man reported that he was approached by two black men, that he was shot, that the men took his cell phone, and that the men fled.

[6] Officer Christopher Mills and Officer Freddie Haddad started working shortly after the second robbery and were patrolling together. At 11:20 p.m., they were dispatched to an apartment in the Hacienda apartment complex, which is across the street from the Spanish Oaks apartment complex, for a report of a third robbery. The victims reported that two black men broke into their apartment and took a cell phone. One victim was assaulted, and the other victim was shot.

[7] Officers Mills and Haddad went to back to the Spanish Oaks apartment complex and parked to watch traffic and provide a police presence. They saw a mid-90's green Camaro drive past with a dark-skinned male "sitting low in the front passenger seat." Tr. Vol. II p. 42. Officer Mills had never seen the vehicle before.

[8] At 12:45 a.m., the officers were dispatched to another location in the Spanish Oaks apartment complex regarding an armed robbery. A woman reported that she was approached in the parking lot by a black male wearing a ski mask and a

gray hoodie. The man was approximately 5'5" tall, was carrying a silver gun, and took her cell phone.

[9] At 1:10 a.m., officers were dispatched to a fifth robbery. This robbery occurred in a residential neighborhood near the Spanish Oaks apartment complex. The victim reported that two black males, one wearing a black hoodie and one wearing a gray hoodie, attempted to rob him and shot his window out.

[10] Officer Mills and Officer Haddad started driving through the neighborhood and saw the same green Camaro parked by a curb. Officer Mills saw a black female driving the vehicle, but he could not see any occupants. As they passed the vehicle, its lights came on. Officer Dustin Greathouse saw the vehicle and shined his spotlight through the windshield. He saw a black female driving the vehicle and two passengers wearing hoodies. When he shined the spotlight into the vehicle, the occupants stared straight ahead and did not look at the officer, which he found strange. Officer Greathouse turned around and got behind the Camaro. Officer Mills also turned around and saw that the Camaro was moving and that Officer Greathouse was behind it. Officer Mills radioed to Officer Greathouse that they "might want to stop that car" because he "had seen it in Spanish Oaks earlier in the night." *Id.* at 51. Officer Greathouse activated his emergency lights to stop the Camaro. The Camaro stopped after a few seconds, and Canady, Hoskin, and Harmon were removed from the vehicle and handcuffed. The officers then found a handgun under the front passenger seat.

[11] In Cause Number 49G02-1702-F3-5493, the State charged Canady with Level 3 attempted armed robbery, two counts of Level 3 felony robbery, two counts of Level 5 felony battery, and one count of Level 6 felony criminal recklessness. In Cause Number 49G02-1702-F3-5490, the State charged Harmon with Level 3 attempted armed robbery, two counts of Level 3 felony robbery, two counts of Level 5 felony battery, and one count of Level 6 felony criminal recklessness. In Cause Number 49G02-1702-F3-5492, the State charged Hoskin with Level 3 attempted armed robbery, two counts of Level 3 felony robbery, two counts of Level 5 felony battery, and one count of Level 6 felony criminal recklessness. In Cause Number 49G02-1704-F3-13118, the State charged Hoskin and Harmon with Level 3 felony robbery and Level 5 felony battery.

[12] Harmon and Hoskin filed motions to suppress in their cases. They argued that the stop of the vehicle violated the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution because the officers did not have reasonable suspicion that the occupants of the vehicle were involved in the robberies. They requested that all evidence obtained as a result of the stop be suppressed. After a hearing, the trial court granted Harmon's and Hoskin's motions to suppress as follows:

> 5. Evidence presented at the hearing supported the conclusion that Officer Mills stopped the vehicle in question, a green Camaro with a female driver, because he was familiar with the area, and did not recognize the vehicle, in addition to robbery reports in the area.

6. There was no description of the vehicle, or of suspects of the robberies other than there were two African American males.

7. The evidence presented does not support that a reasonable suspicion of criminal activity existed specifically involving the green Camaro that allowed for an investigatory stop on February 6, 2017.

Appellants' App. Vol. II pp. 196; Appellants' App. Vol. III p. 200. The trial court suppressed all evidence discovered as a result of the traffic stop and all evidence that stemmed from that evidence. The State filed a motion to reconsider because the ruling was issued before the State's brief was filed. The trial court reconsidered its ruling in light of the State's brief, and the trial court again granted the motions to suppress as follows:

2. Upon review, the Court's position remains unchanged. The evidence presented at hearing, even in consideration with the factors raised by the State, still amounts to an officer stopping a vehicle because it was unfamiliar to him.

3. There must be a reasonable suspicion that the vehicle stopped had been involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968).

4. While the totality of the circumstances certainly point to there being criminal activity in the area, the circumstances do not point to the vehicle stopped in this matter being involved in that activity to a level of reasonable suspicion required. Even the de[s]cription of the suspects, two [A]frican-[A]merican males, did not match the actual

> people in the vehicle, two [A]frican-[A]merican Males and an [A]frican-[A]merican female.

> 5. The evidence presented at the hearing, at one point, was an officer telling another, "We need to stop that car" for no specific reason other than it was unfamiliar to the police in that area.

> 6. While, after the stop, evidence of the crime may have been discovered, the reasons for the stop did not arise to the required reasonable suspicion standard.

Appellants' App. Vol. II p. 216; Appellants' App. Vol. III p. 213. Canady filed a motion to incorporate the suppression order from Hoskin's and Harmon's cases, which the trial court granted. The State then filed motions to dismiss the charges against the Defendants, which the trial court granted. The State now appeals pursuant to Indiana Code Section 35-38-4-3.

## Analysis

[13] On appeal, the State argues that the trial court erred by granting the motions to suppress. "When the State appeals from a negative judgment, it bears the burden to 'show that the trial court's ruling on the suppression motion was contrary to law.'" *State v. Keck*, 4 N.E.3d 1180, 1183 (Ind. 2014) (quoting *State v. Washington*, 898 N.E.2d 1200, 1203 (Ind. 2008)). We evaluate the trial court's findings of fact deferentially, neither reweighing the evidence nor reassessing the credibility of the witnesses. *Id.* "We will affirm if we find within the record 'substantial evidence of probative value' to support the judgment." *Id.* (quoting *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006)). We

review the trial court's conclusions of law, including determinations of reasonable suspicion, de novo. *Id.*

[14] The Fourth Amendment to the United States Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Our jurisprudence reflects two types of police encounters that implicate Fourth Amendment protection: the investigatory stop and the custodial arrest. *Keck*, 4 N.E.3d at 1184. "An investigatory stop is generally brief in duration and is constitutionally permissible so long as the law enforcement officer 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581 (1989), and *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868 (1968)). The custodial arrest constitutes a greater restriction upon the subject's liberty and requires a commensurately greater justification: probable cause. *Id.* An investigatory stop (or *Terry* stop) is at issue here, not a custodial arrest. "When determining whether an officer had reasonable suspicion for a *Terry* stop, we consider whether 'the totality of the circumstances' presented 'a particularized and objective basis' for the officer's belief that the subject was engaged in criminal activity." *Id.* (quoting *Sellmer v. State*, 842 N.E.2d 358, 360 (Ind. 2006)). "Law enforcement officers must have more than an inchoate and

unparticularized suspicion or hunch, but need not have the level of suspicion necessary for probable cause." *State v. Belcher*, 725 N.E.2d 92, 94 (Ind. Ct. App. 2000), *trans. denied*.

[15] The State argues that, given the five robberies within hours of each other and near the same location, the "only question is whether the officers had reasonable suspicion to suspect that the occupants of the green Camaro may be involved." Appellant's Br. p. 17. In support of its argument, the State relies upon *Arcuri v. State*, 775 N.E.2d 1095 (Ind. Ct. App. 2002), *trans. denied*. In *Arcuri*, an armed man wearing a ski mask and a hooded, gray sweatshirt robbed a gas station. The man was described as being only 5'3" to 5'4" tall, and a direction of travel was dispatched to the police. Officers were then told that the suspect had an accent. An officer drove to a nearby bicycle path that he believed could have been an easy route for the robber to flee. He saw a vehicle containing a short, Hispanic passenger who seemed to "be slouching down in the front passenger seat evasively." *Arcuri*, 775 N.E.2d at 1097. The officer then stopped the vehicle and arrested the passenger. The defendant filed a motion to suppress, which the trial court denied.

[16] On appeal, we affirmed, concluding:

> Besides the fact that Arcuri fit the description of the robber, in the case at bar, the robbery was "freshly committed" and Officer O'Donnell believed he was in the area to which the robber was headed based upon the gas station attendant's account of the direction he headed. Under the totality of the facts and circumstances of this case and based upon "[t]he need for swift

and effective law enforcement[,]" Officer O'Donnell's stop of the vehicle in which Arcuri was riding was not improper; rather, it was good police work. *Marsh v. State*, 477 N.E.2d 877, 878 (Ind. 1985) (citing *Terry*, 392 U.S at 1, 88 S. Ct. 1868; *Williams v. State*, 261 Ind. 547, 307 N.E.2d 457 (1974)).

*Id.* at 1099.

[17] We conclude that this case is distinguishable from *Arcuri*. Evidence presented at the hearing on the motion to suppress showed that the robbers had been described by the various victims as: (1) two black men wearing masks, one with curly hair; (2) two black men; (3) two black men; (4) a black male wearing a ski mask and a gray hoodie, approximately 5'5" tall, and carrying a silver gun; and (5) two black males, one wearing a black hoodie and one wearing a gray hoodie. None of the victims described a woman, a get-away vehicle, or a direction of travel of the robbers. When Officer Mills first observed the Camaro in the Spanish Oaks apartment complex, he saw a dark-skinned male sitting low in the passenger seat. When he saw the vehicle again in the neighborhood, he saw a black female driving the vehicle, but he could not see any other occupants. Officer Greathouse saw a black female driving the vehicle and two passengers wearing hoodies. When he shined the spotlight into the vehicle, the occupants stared straight ahead and did not look at the officer. Officer

Greathouse initiated a traffic stop of the vehicle, but he did not observe any traffic violations.[1]

[18] The police here were not aware of a direction of travel of the robbers. The description of the robbers from the victims was inconsistent and also did not match the individuals that the officers saw in the Camaro. The State relies upon evidence that the distinctive green Camaro had not been seen by the officer before the night of the robberies, the vehicle's occupants did not react when Officer Greathouse shined a spotlight into the vehicle, and the two passengers were wearing hoodies. The fact that the two passengers in the Camaro were wearing hoodies in February does not connect them to the robberies. Moreover, the fact that the officers had not seen the Camaro before in the area also does not connect the vehicle's occupants to the robberies. Finally, the fact that the occupants did not react when the officer shined a spotlight on them also does not connect them to the robberies or imply that they were the robbers. As Hoskin points out in his Appellee's Brief, "People may wish to avoid contact with and even ignore police for a variety of valid reasons." Hoskin's Appellee's Brief p. 13. The officers here had a hunch— perhaps a good hunch, but a hunch nonetheless—that the vehicle's occupants were involved in the robberies. A hunch, however, does not amount to

---

[1] "If an officer observes a driver commit a traffic violation, he has probable cause—and thus also the lesser included reasonable suspicion—to stop that driver." *Keck*, 4 N.E.3d at 1184.

reasonable suspicion. *Belcher*, 725 N.E.2d at 94. We conclude that the trial court properly granted the motion to suppress.[2]

## Conclusion

The trial court properly granted the Defendants' motion to suppress. We affirm.

Affirmed.

Vaidik, C.J., and Pyle, J., concur.

---

[2] Because we conclude that the traffic stop violated the Fourth Amendment of the United States Constitution, we need not address the parties' arguments regarding the Indiana Constitution.